UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK



CURTIS BROWN,

                                        Plaintiff,

**ATTORNEY AFFIDAVIT**

                vs.

                                        Civil Action No.
                                        01-CV-1523

CITY OF SYRACUSE, SYRACUSE POLICE DEPT.,
JOHN FALGE, individually and in his capacity as Chief of Police
Of the Syracuse Police Department, and JOHN DOE
A fictitious name intended to indicate individuals
Unknown at this time,

                        Defendants.

        JOSEPH R. PACHECO, II, being duly sworn deposes and says the following:

        1.      I am an attorney duly admitted to practice law in the State of New York and before

the bar of this Court.  I am an Assistant Corporation Counsel for the City of Syracuse, and as such, I

am representing the City of Syracuse and all named defendants in connection with this action.

        2.      I am fully familiar with the facts and circumstances surrounding this case, together

with the proceedings, which have occurred thus far in this action.  I submit this affidavit in support

of defendants' motion pursuant to Rules 56(c) and 12(b)(6) of the Federal Rules of Civil Procedure

and the Federal Arbitration Act, 9 U.S.C. §1 et. seq. for an order dismissing plaintiff's complaint

and/or staying the proceedings, and compelling completion of the pending arbitration.

        Plaintiff claims that on or about April 27, 2000, he was suspended from his employment

with the Syracuse Police department.  He complains his suspension is improper and excessive, and

was done solely for illegal and discriminatory reasons.

        It is important to note that the above issues, which form the basis of plaintiff's cause of

action in the instant case, have been grieved pursuant to the collective bargaining agreement

between the Syracuse Police Benevolent Association and the City of Syracuse, herein attached as Exhibit "A". Specifically, plaintiff filed a demand for arbitration with the American Arbitration Association and has already had a full day of hearing. This demand for arbitration involved grieving the discipline of the petitioner for conduct deemed in violation of the New York State Penal Law and for failing to conduct himself in a manner appropriate for a police officer. Plaintiff was suspended pending termination, for his actions. The disciplinary reports are attached as Exhibit "B."

Paragraph 20 of petitioner's complaint asserts that "On June 20, 2000, Mr. Brown accepted his responsibility, bad judgment and a plea disposing of the matter." Plaintiff fails to mention that the "plea" entered was guilty to endangering the welfare of a child and that he allocuted to renting a hotel room and housing in it a fifteen year-old female runaway. He also fails to mention that he admitted to knowing the girl was being sought by her parents and the New York State Police and intentionally failed to disclose her whereabouts. (See transcript of DeWitt Town Court, attached as Exhibit "C")

New York State law is clear that a conviction of a crime involving moral turpitude mandates termination of a police officer. {See, N.Y.S. Public Officer's Law Sect.30(1)(e).} This issue is more fully explored in the attached Memorandum of Law. It should also be noted that plaintiff was arrested by the New York State Police, and prosecuted in the Town of DeWitt by the Onondaga County District Attorney, and not by the defendants.

Nowhere in plaintiff's complaint does he allege that a similarly situated officer, i.e., one who was convicted of a crime involving his oath of office, was treated or dealt with any differently than plaintiff.

8.     Finally, if the court is not persuaded by Defendants' arguments for dismissal, this

matter must be stayed.  Plaintiff has grieved all of the above stated actions of the Syracuse Police Department, as per binding arbitration provision of the Collective Bargaining Agreement between the Syracuse Police Department Benevolent Association and the City of Syracuse.  Petitioner is therefore barred from bringing this action and his complaint should be dismissed or the action stayed, pursuant to Federal Arbitration Act, 9 U.S.C. Sect. 1 et. seq. and accordingly, defendants now move seeking that relief.   Defendants' legal arguments in support of this motion are more fully articulated in the accompanying memorandum of law.

WHEREFORE, deponent respectfully prays for an order dismissing plaintiff's complaint pursuant to Rules 56(c) and 12(b)(6) of the Federal Rules of Civil Procedure; or staying the proceeding in the action pursuant to the Federal Arbitration Act 9 U.S.C. §1 et. seq., and awarding such further relief as the Court may deem proper.

Joseph R. Pacheco II
Bar Roll No. 507836

Sworn to before me this
8th day of November, 2001

Notary Public

# EXHIBIT A

# 1998 - 1999

## LABOR AGREEMENT

### BETWEEN

## THE SYRACUSE POLICE BENEVOLENT ASSOCIATION, INC.

### AND

## THE CITY OF SYRACUSE

## TABLE OF CONTENTS

**PAGE**

PREAMBLE . . . . . . . . . . . . . . . . . . . . . .   1

ARTICLE 1 - RECOGNITION AND APPLICATION OF CONTRACT. . . . .   1
     1.1 - Collective Bargaining Unit . . . . . . . . .   1
     1.2 - Application of Contract. . . . . . . . . . .   1

ARTICLE 2 - OBLIGATIONS OF THE PBA AND CITY. . . . . . . .   2
     2.1 - No Discrimination. . . . . . . . . . . . .   2
     2.2 - No Strike. . . . . . . . . . . . . . . . .   2

ARTICLE 3 - AGENCY SHOP & CHECK-OFF OF DUES. . . . . . . .   2
     3.1 - Check-off of Dues. . . . . . . . . . . . .   2
     3.2 - Amount to be Checked-Off . . . . . . . . .   3
     3.3 - Indemnity. . . . . . . . . . . . . . . . .   3

ARTICLE 4 - ASSOCIATION BUSINESS . . . . . . . . . . . .   4
     4.1 - Assignment of PBA President. . . . . . . .   4
     4.2 - PBA Annual Conventions . . . . . . . . . .   4
     4.3 - Pay for Contract Negotiations. . . . . . .   4
     4.4 - Pay for Officer Days . . . . . . . . . . .   5
     4.5 - Release of Scheduled Duty for PBA Meetings . .   5

ARTICLE 5 - SALARIES AND WAGES . . . . . . . . . . . .   5
     5.1 - Salary and Wage Increases. . . . . . . . .   5
     5.2 - Advancement for Officers . . . . . . . . .   6
     5.3 - Longevity Pay. . . . . . . . . . . . . . .   6
     5.4 - Night Shift Differential . . . . . . . . .   6

ARTICLE 6 - UNIFORMS . . . . . . . . . . . . . . . . .   7
     6.1 - Uniform Replacement. . . . . . . . . . . .   7
     6.2 - Uniform Allowance. . . . . . . . . . . . .   8

ARTICLE 7 - VACATIONS & HOLIDAYS . . . . . . . . . . . .   8
     7.1 - Vacations. . . . . . . . . . . . . . . . .   8
     7.2 - Holidays . . . . . . . . . . . . . . . . .   9
     7.3 - Personal Leave . . . . . . . . . . . . . .   9

ARTICLE 8 - OVERTIME PAY . . . . . . . . . . . . . . .   10
     8.1 - Overtime . . . . . . . . . . . . . . . . .   10
     8.2 - Court Appearance . . . . . . . . . . . . .   11
     8.3 - Compensatory Time Earned Prior to Jan. 1, 1989   11
     8.4 - Compensatory Time Earned After Jan. 1, 1989. .   12
     8.5 - Call-In Time . . . . . . . . . . . . . . .   13

ARTICLE 9 - HOSPITALIZATION, MEDICAL PLAN AND DENTAL PLAN.   13
     9.1 - Group Medical Insurance. . . . . . . . . .   13

```
      9.2 - Group Plan in Effect . . . . . . . . . . . .   13
      9.3 - Group Dental Plan. . . . . . . . . . . . . .   14
      9.4 - Retirees . . . . . . . . . . . . . . . . . .   15

ARTICLE 10 - GRIEVANCE AND ARBITRATION . . . . . . . . .   15
     10.1 - Grievance Procedure . . . . . . . . . . . .   15
     10.2 - Limitations on Arbitrator's Authority . . . .  16
     10.3 - Time Limitations. . . . . . . . . . . . . .   16

ARTICLE 11 - DISCHARGE AND DISCIPLINE. . . . . . . . . .   17
     11.1 - Procedure in Disciplinary Disputes. . . . .   17
     11.2 - Effect of Election. . . . . . . . . . . . .   18
     11.3 - Departmental Investigation. . . . . . . . .   19
     11.4 - Conduct of Arbitration Hearing. . . . . . .   20
     11.5 - Limitations on Arbitrator's Authority . . . .  20
     11.6 - Record of Discipline. . . . . . . . . . . .   21
     11.7 - Procedure . . . . . . . . . . . . . . . . .   21

ARTICLE 12 - PROMOTIONAL LISTS . . . . . . . . . . . .   22

ARTICLE 13 - RETIREMENT PLAN . . . . . . . . . . . . .   23
     13.1 - City Obligation . . . . . . . . . . . . . .   23
     13.2 - Limitations on City Liability . . . . . . .   23

ARTICLE 14 - GROUP LIFE INSURANCE. . . . . . . . . . .   24

ARTICLE 15 - MANAGEMENT RIGHTS . . . . . . . . . . . .   24

ARTICLE 16 - RIGHTS OF EMPLOYEES . . . . . . . . . . .   25
     16.1 - Status. . . . . . . . . . . . . . . . . . .   25
     16.2 - Public Trust. . . . . . . . . . . . . . . .   25
     16.3 - Investigation . . . . . . . . . . . . . . .   26

ARTICLE 17 - DUTY AND SHIFT ASSIGNMENT . . . . . . . .   30

ARTICLE 18 - SCHOOLING AND TRAINING. . . . . . . . . .   32

ARTICLE 19 - NON-JOB RELATED SICK LEAVE. . . . . . . .   33
     19.1 - Members Employed Prior to December 31, 1974 .  33
     19.2 - Members Employed After December 31, 1974. . .  33
     19.3 - General Conditions. . . . . . . . . . . . .   34
     19.4 - Sick Leave Incentive Program. . . . . . . .   35

ARTICLE 20 - AUTOMOBILE ALLOWANCE. . . . . . . . . . .   35
     20.1 - Allowance . . . . . . . . . . . . . . . . .   35
     20.2 - Insurance Rider . . . . . . . . . . . . . .   36

ARTICLE 21 - SAVINGS CLAUSE. . . . . . . . . . . . . .   36

ARTICLE 22 - DOME VOLUNTARY OVERTIME LISTS . . . . . .   37
```

ARTICLE 23 - FUNERAL PAY . . . . . . . . . . . . . . . . .    39

ARTICLE 24 - MISCELLANEOUS PROVISIONS. . . . . . . . . . .    40

ARTICLE 25 - EMERGENCY SICK LEAVE BANK . . . . . . . . . .    41
              A. ELIGIBILITY. . . . . . . . . . . . . . .    41
              B. EMERGENCY SICK LEAVE BOARD . . . . . . . .    41
              C. CONTRIBUTIONS. . . . . . . . . . . . . .    42
              D. ELIGIBILITY FOR BENEFITS . . . . . . . . .    43
              E. RENEWAL OF APPLICATION . . . . . . . . . .    44

ARTICLE 26 - SENIORITY . . . . . . . . . . . . . . . . . .    44

ARTICLE 27 - ACCIDENT REVIEW COMMITTEE . . . . . . . . . .    44

ARTICLE 28 - ENTIRE AGREEMENT. . . . . . . . . . . . . . .    46

ARTICLE 29 - STATUTORY PROVISION . . . . . . . . . . . . .    47

ARTICLE 30 - TERMINATION AND MODIFICATION. . . . . . . . .    47

APPENDIX A

## PREAMBLE

This is a Labor Contract effective January 1, 1998 and terminating midnight December 31, 1999 between the City of Syracuse, New York (hereafter called the "City") and the Syracuse Police Benevolent Association, Inc. (hereafter called the "P.B.A." or the "Association").

## ARTICLE 1

### RECOGNITION AND APPLICATION OF CONTRACT

#### 1.1 Collective Bargaining Unit

The City recognizes the P.B.A. as the sole and exclusive collective bargaining agent for all Civil Service Police Officers including those of the competitive class employed in the Department of Police and City of Syracuse but excluding the Chief of Police, the Deputy Chiefs of Police, Parks Attendants, Creek Patrolmen, Meter Maids, Police Trainees, School Crossing Guards and all other civilian employees of the Department.

#### 1.2 Application of Contract

This Contract shall apply to the Police Officers within the bargaining unit defined in Section 1.1.

1

## ARTICLE 2

### OBLIGATIONS OF THE P.B.A AND CITY

2.1 No Discrimination

(A)  The  parties  agree  not  to  discriminate  against  any person within the collective bargaining unit because of membership or non-membership in the Association.

(B)  The  parties  reaffirm  that  they  shall  continue  to  apply the  terms  and  conditions  of  this  Agreement  in  a  manner  not violative  of  Federal  and  State  laws,  binding  upon  the  City, prohibiting  discrimination  with  respect  to  race,  creed,  color, national origin, sex and age.


2.2 No Strike

The  P.B.A.  agrees  that  it  will  not  call,  sanction  or encourage in any way any strikes, picketing, slowdowns, concerted refusals to perform assigned work or any other kind of job action which is designed to impede or has the effect of impeding normal, efficient operations of the Department nor shall the P.B.A. cause, instigate, encourage or condone any such action.


## ARTICLE 3

### AGENCY SHOP & CHECK-OFF OF DUES

3.1 Check-off of Dues

Pursuant  to  Section  208  of  the  Civil  Service  Law  the  City

2

shall, while this Contract remains in effect, deduct from each Police Officer's pay each month on a bi-weekly basis, his monthly membership dues in the Association and transmit the money so deducted, together with a list of names of the Officers from whose earnings the deductions were made, to the P.B.A. on or before the 15th day of the month following that in which the deductions were made. No deductions shall be made for any back dues arrearage nor to recoup any amount not deducted because the Officer did not receive pay in any given payroll period.

3.2 Amount to be Checked-Off

The P.B.A. will certify in writing to the City the amount of its regular monthly dues and any assessments to be deducted under the provisions of this Article. The dues money is to be made payable to P.B.A. and sent to the Treasurer as certified in writing to the City by P.B.A. Any changes in the amount of P.B.A. dues to be deducted must be similarly certified by the P.B.A. in writing to the City. Such changes shall not become effective until 60 days following receipt by the City of such certification.

3.3 Indemnity

The P.B.A. shall indemnify and save the City harmless against any and all claims, demands, suits or other forms of liability which may arise out of or by reason of action taken by the City for the purpose of complying with any of the provisions of this

3

Article 3.


## ARTICLE 4

## ASSOCIATION BUSINESS

### 4.1 Assignment of P.B.A. President

The duly elected President of the P.B.A. shall be assigned to the Community Relations Staff on the day shift.  In the event that the President of the P.B.A. is disabled from performing his duties as President for ten or more consecutive days, then the Executive Vice-President of the P.B.A. shall act on his behalf and shall be accorded the same rights and privileges as the President insofar as Police duties are concerned and shall have all authority invested in the President to represent the P.B.A.


### 4.2 P.B.A. Annual Conventions

Subject to the needs of the Department, the President, Executive Vice-President, Vice-President, Secretary, Treasurer, Assistant Treasurer, Sergeant at Arms, or their respective designees, shall be granted relief of all Police duties for a period of four days with pay to attend the annual Police Conference of New York Convention.


### 4.3 Pay for Contract Negotiations

Formal members of the PBA's negotiating team shall be paid for time lost from work in order to be present at the negotiation

4

table.   Paid negotiating time may be taken in one-half day increments.

## 4.4 Pay for Officer Days

In addition to the above Sections of this Article, PBA will be allowed a total of 6 paid, officer-days per year, to be used as determined by the President of PBA.

## 4.5 Release of Scheduled Duty for PBA Meetings

Members of the PBA Executive Board will be released from scheduled duty for PBA meetings subject to following conditions:

    (1)   Only once per month for regular PBA meeting;

    (2)   Only for night meetings;

    (3)   Must work rest of shift before and after meeting;

    (4)   No expansion of either Executive Board or Board of Directors.

## ARTICLE 5

### SALARIES AND WAGES

## 5.1 Salary and Wage Increases

Effective January 1, 1998; January 1, 1999; and July 1, 1999 the base salaries of the employees covered by this contract shall be as respectively set forth in the salary schedule appended to this contract as Appendix A.

## 5.2 Advancement for Officers

A member of this unit who is promoted to a higher officer rank shall be compensated at the full rate applicable to the new rank immediately upon his promotion to such higher rank; provided, however, that such promoted officer shall continue to be subject to the probationary period and if returned to his former rank within that probationary period shall have his compensation reduced to that applicable to the rank to which he is returned. This Section shall not apply to temporary transfers to higher ranks.

## 5.3 Longevity Pay

Effective January 1, 1999, longevity payments shall be made as follows:

        10 years -    $500

        15 years -    $700

        20 years -    $900

        25 years - $1,100

        30 years - $1,300

## 5.4 Night Shift Differential

An increment of 15 cents per hour shall be given to all personnel for work performed between the hours of 1600 and 0800, provided at least 6 hours per day is worked during these hours on a regular shift basis.  Effective 1/1/95, said increment shall be

20 cents per hour.  The night shift differential shall also be paid for vacation and personal leave days as set forth in Section 7.1 and 7.3 of this Contract provided the following condition is met:  The officer must have received the night shift differential for the majority of hours for which he was paid during the calendar month preceding the taking of the vacation or personal leave in question.

The night shift differential shall be paid out semi-annually, prior to July 15th and December 15th of each year.

## ARTICLE 6

### UNIFORMS

#### 6.1 Uniform Replacement

6.1.1   The City agrees to furnish at its own cost to each member a Class B uniform.  Any item of clothing or equipment which is destroyed or damaged beyond repair in the line of duty shall be replaced by the City without cost and without deduction for depreciation.

6.1.2   The City agrees to furnish at its own cost new uniforms where a change in uniform is required by departmental regulations or by involuntary transfer of an officer to a unit where departmental regulations require uniform elements not required for uniformed police generally or not previously issued or provided by the City to the officer involved.

7

## 6.2 Uniform Allowance

An Annual cash uniform allowance of $700.00 shall be paid to each officer by January 31 of the year involved.  The annual cash uniform allowances shall be designated and used for the replacement or acquisition of items of required uniform clothing or equipment.

## ARTICLE 7

### VACATIONS & HOLIDAYS

## 7.1 Vacations

7.1.1   Effective January 1, 1999, all Syracuse City police officers, regardless of their seniority date, will receive the following vacation benefits:

|  |  |
|---|---|
| 1 - 4 years | - 15 days |
| 5 - 9 years | - 18 days |
| 10 - 14 years | - 20 days |
| 15 - 20 years | - 25 days |

7.1.2   In the event the City requires a police officer to work during the officer's scheduled vacation which was approved by the Chief or his designee, such an officer may carry over the vacation days on which he was so required to work and take such vacation days in the following calendar year.

## 7.2 Holidays

7.2.1   Each member of the P.B.A. shall receive an additional lump sum payment on or before November 15th of year involved equal to 13 days salary for each member's respective rank, this sum shall be deemed to be compensation for 13 legal holidays, whether or not such member shall be required to work on such days.   For the purposes of this Section, the 13 holidays will be deemed to be the following:   New York's Day, Lincoln's Birthday, Washington's Birthday, Martin Luther King's Birthday, Easter, Flag Day, July 4th, Labor Day, Columbus Day, Thanksgiving Day, Christmas Day, and July 1st, as well as one additional paid holiday which became effective on February 3, 1999.

7.2.2   Those employees who are honorably discharged veterans and who are entitled by Section 63 of the Public Officers Law to a day off for Veteran's Day shall be entitled to take a compensatory day off within 90 days of Veteran's Day.

## 7.3 Personal Leave

Each member of the P.B.A. shall be granted three days of personal leave each year, subject to the rules and regulations of the Department which are not inconsistent with the following conditions:

(1) Leave shall be granted to the first member applying at least 3 days before the requested leave date unless a genuine emergency exists on the requested leave date;

9

(2)   Where   a   request   is   made   30   or   more   days   in advance, seniority shall prevail;

(3)   No more than 3 persons per day on each of the 3 administrative   zones   (not   bureaus   and/or   shifts)   may   be   on personal leave.  Other departmental rules will continue to apply.

(4)   Up to 3 unused personal leave days may be carried forward from prior years.

**ARTICLE 8**

**OVERTIME PAY**

8.1 Overtime

It is further agreed that all members shall be paid cash at the rate of time and one-half for all ordered overtime work except as provided in Section 8.4

8.2 Court Appearance

Off duty time spent in Court as scheduled by the assignment officer shall be fixed at a minimum of two hours pay at the rate of time and one-half and all hours in excess of two hours actually spent in court in any one day shall be paid hour for hour at the rate of time and one-half; except that if the police officer is scheduled  for  such  court  appearance  after  coming  off  any  shift ending between 4:00 a.m. and 8:00 a.m. the same day, he shall receive a minimum of four hours pay at the rate of time and one-half and all hours in excess of four hours actually spent in court

10

in any one day shall be paid hour for hour at the rate of time and one-half.   An officer scheduled for court time on his rest day shall receive a minimum of three hours pay at the rate of time and one-half and all hours in excess of three hours actually spent in court on his rest day shall be paid for at the rate of time and one-half.   To be eligible for this benefit the police officer must appear in court in uniform.

8.3 Compensatory Time Earned Prior to Jan. 1, 1989

8.3.1   Compensatory time earned prior to January 1, 1985 shall be paid at separation or retirement in cash at the rates which were in effect at the time earned.   However, all compensatory time accrued prior to January 1, 1978 shall, when paid for, be paid at the rates of pay in effect on December 31, 1977.   Compensatory time earned after December 31, 1977 and prior to January 1, 1985 shall be credited at the rate of pay in effect at the time when earned.

8.3.2   Compensatory time earned after January 1, 1985 which has not been taken shall be paid at the current rates existing at the time of separation, retirement or other pay out (on a department-wide basis) at the employer's option.

8.3.3   All compensatory time, no matter when earned, shall be used in reverse chronological order, so that employees use most recently earned compensatory time first.

8.3.4    There  shall  be  no  terminal  leave  based  on  accrued compensatory  time.    Prior  to  retirement,  an  officer  shall  be  paid in  cash  for  accrued  compensatory  time  and  severed  from  the Department.

## 8.4.1 Compensatory Time Earned After Jan. 1, 1989

Police officers, at their option, may accumulate, at time and one-half  rates,  compensatory  time  in  lieu  of  receiving  overtime pay  for  overtime  actually  worked,  except  as  provided  in  Article 24.    This  compensatory  time  off  will  be  taken  subject  to  the existing  rules  covering  the  taking  of  personal  days  and  vacation days.    Although  an  officer  is  not  limited  in  the  amount  of compensatory  time  which  he  or  she  may  accumulate,  the  officer  will only  be  paid  up  to  a  maximum  160  hours  at  the  time  of  separation from  the  Department.

## 8.4.2 Effective January 1, 1999 Compensatory Time Earned After Jan. 1, 1989

An  adjustment  shall  be  made  increasing  the  160  hours  to  a maximum  of  240  hours.    This  is  not  intended  to  limit  an  officer  in the  amount  of  compensatory  time  which  he/she  may  accumulate  at their  option.    Effective  January  1,  1999,  compensatory  time  earned after  January  1,  1989,  shall  be  increased  to  240  hours  of  "new bonus".    There  is  no  cap  on  the  amount  of  compensatory  time  that can  be  accumulated,  however,  the  officer  will  only  be  paid  for  up

to a maximum of 240 hours of "new bonus" at the time of separation from the Department.

## 8.5 Call-In Time

The employer shall pay for a minimum of four hours' work at overtime rates when an off-duty employee is called in to work ordered overtime for a period of time which is not contiguous to that employee's regular tour of duty.

## ARTICLE 9

### HOSPITALIZATION, MEDICAL PLAN AND DENTAL PLAN

## 9.1 Group Medical Insurance

Effective January 1, 1995, the medical insurance coverage deductible will be $125.00 for employee only coverage per person per year and $375.00 per family per year.

Effective January 1, 1999, the employee contribution for family medical coverage will increase to $25.00 per month and the contribution required for officers enrolled in employee only coverage will become $10.00 per month.

## 9.2 Group Plan in Effect

The City shall continue to provide the same benefit plans presently provided to the PBA, along with the present enhancements that the City extends to other City employees.

The City may change the present Group Medical Insurance Plan

or Dental Plan provided that any new Plan put into effect must offer equal or improved benefits as those prevailing at the time this Contract was signed and that there be no loss of benefits because of changes in waiting periods because of any change of carriers.   The City will continue its past practices regarding when coverage begins, ends, and/or may be changed.

## 9.3 Group Dental Plan

The City will make available to bargaining unit employees a Group Dental Insurance Plan with benefit levels which are generally equal or comparable to the dental benefit levels contained as of January 1, 1983 in the POMCO T1 Dental Plan. Employees who elect employee only coverage will pay $4.35 per month for such coverage with the City paying the remainder of such cost.   Employees who elect family coverage will pay $11.525 per month for such family coverage with the City paying the remainder of such cost.   Effective January 1, 1990, employees who elect employee only coverage will pay $7.00 per month and employees who elect family coverage will pay $15.00 per month.

For the duration of this contract the City shall continue to provide, at no additional cost to covered employees, the added orthodontia coverage benefit levels which were placed in effect in the Spring of 1985.

Effective January 1, 1999, the annual per person dental benefit will be capped at $1500.00.

14

9.4 Retirees

Retirees who receive medical benefit coverage will have such coverage designated as "secondary" coverage to that received by the retiree through a new job or his/her spouse.

## ARTICLE 10

### GRIEVANCE AND ARBITRATION

10.1 Grievance Procedure

A grievance shall be defined as a claim that the City violated a provision of this Contract (except as to a grievance concerning discipline or discharge which will be processed in accordance with the procedures set forth in Article 11) and shall be resolved by use of the following procedure:

Step 1: The grievance shall be first presented in writing by the Association or a member to the Chief or the First Deputy Chief who, within ten working days thereafter, shall reply in writing to the Association.

Step 2: If such reply is not satisfactory to the Association or to the member, the Association or members shall present such grievance in writing, together with a copy of the reply from the Chief, to the Mayor of the City. Within ten working days thereafter, the Mayor shall reply in writing to the Association or member.

Step 3: If the grievance remains unresolved and if the

15

grievance involves an alleged violation by the City of an express provision of this Contract, then the Association may submit the grievance in writing (copy to the City) to the currently agreed upon rotating panel (hereinafter referred to as the "panel"), to resolve the grievance.  The decision of the arbitrator shall be final and binding on both parties to this Contract.  The fees and expenses of the arbitrator shall be shared equally by the City and the Association, except that neither the City nor the Association shall be liable for the expense of any arbitration for any member of the bargaining unit who is not a member of the Association at the time the grievance occurs, where such arbitration has not been initiated by the Association, except and to the extent required by law.

## 10.2 Limitations on Arbitrator's Authority

The arbitrator shall have no power to add to, subtract from or change any of the provisions of this Contract nor shall he have authority to render any decision which conflicts with a law, ruling or regulation binding upon the City by higher authority, nor to imply any obligation on the City which is not specifically set forth in this Contract.  Awards may not be retroactive beyond two weeks prior to service of the written grievance on the City.

## 10.3 Time Limitations

If a written copy of the grievance was not served on the City

16

within 14 calendar days after the act, occurrence or event giving rise to the grievance or if the grievance was not submitted in writing to the panel (copy to the City) within 60 days after the date of its Step 1 presentation in writing to the Chief or designated Deputy Chief, the grievance will be deemed waived and there shall be no right to arbitration.

## ARTICLE 11

### DISCHARGE AND DISCIPLINE

### 11.1 Procedure in Disciplinary Disputes

In the event of a dispute concerning the discipline or discharge imposed upon a police officer, the following procedures shall be followed.

Step 1:   City shall advise an officer in writing that it proposes to commence disciplinary action against him.  Such notice shall describe the general circumstances for which discipline is sought and optionally the penalty which the City seeks to impose. Within seven days (exclusive of Saturdays and Sundays) following service of that notice on the officer and the union, the parties (the chief, the officer, the union and any of their attorneys) shall meet to discuss voluntary resolution of the charges.  If no voluntary resolution can be made at the meeting described above, then within three days (exclusive of Saturdays and Sundays) after such meeting, the officer must serve written notice as described in Section 11.2 if he desires to follow Step 2 of this Article.

17

Failure to make a timely election shall automatically mean that the procedures of Section 75 of the Civil Service Law shall be followed, and there shall be no right to arbitration under the provisions of this Agreement.  If the officer waives his Section 75 rights and makes a timely election for arbitration, then the remaining step will be followed.  If an employee has been suspended without pay he may waive his Section 75 rights and demand arbitration immediately.  In such a case, within 72 hours the City shall serve a description of the charges on which it relies for the discipline sought.

    <u>Step 2:</u>  The parties will utilize the panel in matters of discharge and discipline under this article.  If the officer has made a timely election in Step 1, the Association shall file in writing a request for arbitration with the panel.  The arbitration shall be held within twenty calendar days of the date of request.  The arbitrator shall render his decision within fourteen days following close of the record.  The finding of the arbitrator shall be final and binding upon the parties.  There shall be no extensions of the foregoing time limits except by mutual agreement.  The arbitrator may, under appropriate circumstances, issue an interim verbal decision, to be followed by a written opinion and award.

## 11.2 Effect of Election

    To elect the procedures set forth in Step 2 of Section 11.1,

18

the officer must file a written notice of such election with the Chief within the time limits set forth in Step 1 of Section 11.1. Such election must include a written waiver of all rights under Section 75, including limitations as to type or degree of punishment or to any right to reinstatement under Section 75, or otherwise, pending final determination by the arbitrator selected, or to the holding of a hearing within a 30 day period of suspension without pay.

## 11.3 Departmental Investigation

It is understood that, notwithstanding an election by the officer to follow the arbitration procedure above, the Department may investigate the facts surrounding the grievance in any manner it deems appropriate, subject to the terms of this Agreement, including the conduct of a hearing as authorized pursuant to Section 75 of the Civil Service Law.  However, should the Chief, in his discretion, decide to hold such a hearing, the officer under investigation shall not be bound by the results of said hearing, nor shall he be obligated to appear in person or by counsel.  Counsel for the Association shall have the right to examine the transcript and exhibits of the Section 75 hearing, if held, and to make copies thereof at the Association's expense.  No penalty decided upon after said hearing shall be effective if arbitration has been elected, nor shall any findings of said hearing or recommended penalties be admissible in arbitration.  No

19

record of the departmental hearing or results thereof shall be placed in the officer's personnel file if arbitration has been elected.

## 11.4 Conduct of Arbitration Hearing

In any arbitration hearing held under the provisions of this Article, both the Department and the police officer involved shall have the right to be represented by counsel and to present witnesses and engage in the cross-examination of witnesses presented by the other party. The arbitration hearing shall be a de novo proceeding, and a decision shall be made by the arbitrator on the basis of the legal evidence as presented at the arbitration hearing. The fees of the Arbitrator and necessary expenses of the arbitration proceedings shall be shared equally by the City and the Association. Each party shall bear the expense of the preparation and presentation of its own case.

## 11.5 Limitations on Arbitrator's Authority

The Arbitrator shall have no power to add to, subtract from or change any of the provisions of this Contract, nor shall he have authority to render any decision which conflicts with a law, ruling or regulation binding upon the City by a higher authority, nor to imply any obligation on the City which is not specifically set forth in this Contract.

20

## 11.6 Record of Discipline

Written reprimands (and writings evidencing verbal reprimands) shall be purged from an officer's official personnel folder, twenty-four months after issuance.

If an officer is found not guilty of misconduct or incompetency requiring discipline, there shall be no record kept in the officer's official personnel folder of the disciplinary proceeding.

## 11.7 Procedure

The City and the PBA agree to the following procedure with respect to the disciplinary cases in which the officer elects arbitration rather than the Section 75 proceeding.

A.   The City may impose suspension without pay or a written reprimand immediately and prior to a hearing.  In such a case, PBA may invoke the arbitration clause and the grievance involving the imposed discipline shall be given priority treatment and will be held within 20 days of the submission of the grievance to arbitration.

B.   In the case of a prospective discharge, the officer will be placed on suspension without pay until the arbitration proceeding.  In the case of a demotion or fine the penalty will be deferred until the arbitration decision.  (A suspension without pay will not be deemed to be a fine).  In any of the cases outlined in this paragraph, or if the city defers the imposition of

any other penalty, the City may invoke the arbitration clause and the case will be given priority treatment and will be held within 20 days of the submission of the grievance by the City to arbitration.

C.    The parties intend that discipline arbitrations will be held in an expeditious manner.   All correspondence or telephone calls submitting a case to arbitration or determining the date or dates to be selected or the case or cases to be heard, will be on notice to the opposing party with both the City and the PBA providing that notice to representatives designated by the PBA and the City.

D.    In all future arbitrations between the City and the PBA either side may provide for a transcript by a court reporter and/or a taping of the proceedings at its own cost unless there is agreement to share cost.

## ARTICLE 12

### PROMOTIONAL LISTS

To the extent possible under Civil Service Law and Regulations, the City will endeavor to have all eligibility lists for promotion in the Department of Police to have a life term of two years.

22

## ARTICLE 13

## RETIREMENT PLAN

13.1 City Obligation

The City agrees that it will continue to provide the twenty year retirement plan, now in effect, for all members of the bargaining unit with the practices heretofore prevailing. The one year final average salary option specified in the Retirement and Social Security Law, Section 302 subd. 9(d) shall be continued.

Additionally, the City shall make available the program established by Section 375-i of the New York State Retirement Law. Effective January 1, 1994 the City shall adopt the benefits set forth in Section marked 384(e) of the New York State Retirement and Social Security Law (Policemen's and Firemen's Retirement System) for members of this collective bargaining unit. On December 31, 1994 the City will withdraw from Section 384(e) thereby placing unit employees hired after that date in Section 384(d). This withdrawal will take place at such date closest to December 31, 1994 as allowed by the New York State Retirement System to accomplish the purpose intended.

13.2 Limitation on City Liability

It is understood that the City's liability under this Article is limited to making the required contributions.

23

## ARTICLE 14

### GROUP LIFE INSURANCE

The City shall provide group life insurance for each member of the bargaining unit (including retired members) in accordance with the following schedule:

|  | Life | AD&D |
|---|---|---|
| All active members and all<br>    retired members under 60 | $25,000.00 | $10,000.00 |
| All retired members age 60<br>    after 1/1/70 | $5,000.00 | ---------- |
| All retired members age 60<br>    prior to 1/1/70 | $1,000.00 | ---------- |

The City shall guarantee the benefit level regardless of cost and shall own any dividends earned.  Subject to such conditions as may be imposed by the carrier, the City will attempt to provide active police officers with an option to purchase, at no cost to the City, an additional $10,000.00 of term life insurance.

## ARTICLE 15

### MANAGEMENT RIGHTS

Except where expressly limited by a specific provision of this Contract, the Chief of Police shall have the sole and exclusive right to direct and manage the Department of Police, including but not limited to the following rights:  to determine the size, composition and organization of the Department and any

24

subunits therein; to determine the facilities and equipment to be utilized and/or maintained; to determine the hours of work and work schedules; to determine what work is to be performed by the Department, its place of performance and who is to perform it; to determine the assignments and job duties; to determine the rules and regulations governing the Department; to determine what training or instructional programs are necessary; to determine the methods, means, equipment and personnel by which any and all Departmental operations are to be conducted; to determine reasonable standards of performance; and to determine practices and procedures for the efficient, disciplined and orderly operations of the Department; and from time to time to change any or all of the above determinations.

## ARTICLE 16

### RIGHTS OF EMPLOYEES

#### 16.1 Status

Members of the force hold a unique status as Public Officers in that the nature of their office and employment involves the exercise of a portion of the Police power of the municipality.

#### 16.2 Public Trust

The security of the community depends to a great extent on the manner in which Police Officers perform their duty.   Their employment is thus in the nature of a public trust.

## 16.3 Investigation

The wide ranging powers and duties given to the Department and its members involve them in all manner of contacts and relationships with the public. Out of these contacts may come questions concerning the actions of the members of the Force. These questions may require investigation by superior officers designated by the City. In an effort to insure that these investigations are conducted in a manner which is conducive to good order and discipline, the following rules are hereby adopted:

(a) Each employee shall have the right of access to his official personnel folder on reasonable notice. All documents placed in that folder after the date this contract becomes enforceable shall be date-stamped. Nothing which is not contained in the official personnel folder may be adversely used against an employee for the purpose of formal evaluation or discipline unless he has first received notice of such document. Testimony concerning prior verbal warnings or instructions may be admitted as to the issue of penalty.

(b) The interrogation of a member of the Force shall be a reasonable hour, preferably when the member of the Force is on duty, unless the urgency of the investigation dictates otherwise. If any time is lost, the member of the force shall be given compensatory time.

(c) The interrogation shall take place at a location

26

designated by the Chief of Police -- ordinarily at Police Headquarters or a location having a reasonable relationship to the incident alleged.

(d)   The member of the Force shall be informed of the nature of the investigation before any interrogation commences. Sufficient information to reasonably apprise the member of the allegations should be provided.  If it is known that the member of the Force is being interrogated as a witness only, he should be so informed at the initial contact.

(e)   The questioning shall be reasonable in length. Reasonable respites shall be allowed.  Time shall also be provided for personal necessities, meals, telephone calls, and rest periods as are reasonably necessary.

(f)   All members of the Force shall be obligated to answer any questions concerning their conduct as it relates to their employment, except those which violate their constitutional, legal or contractual rights.

(g)   The member of the Force shall not be subjected to the use of offensive language by the investigating officer nor shall he be threatened with transfer or disciplinary action unless he refuses to answer proper questions as defined in section (f). The foregoing prohibition against threats shall not be construed to prohibit the investigating officer from advising the member of the Force of the character of the discipline the department intends to impose nor from advising the member of the Force that

27

if he refuses to answer proper questions, as above, he may be subject to additional charges. The individual's consent to disciplinary action shall not be binding in less than 24 hours after he is advised of the nature of such disciplinary action or its alternatives except in circumstances where there is danger to the public.

(h) The complete interrogation of the member of the Force shall be recorded mechanically or by a department stenographer. There will be no "off-the-record" questions except by mutual consent of both parties. All recesses called during the questioning shall be recorded.

(i) If a member of the Force is under arrest, or is likely to be, or he is a suspect or the target of a criminal investigation, he shall be given his rights pursuant to the current decisions of the United States Supreme Court.

(j) In non-criminal cases where infractions are nevertheless of a serious character, the individual shall have an opportunity to consult within 24 hours with his counsel and/or Association representative, if he so requests, before being questioned or before being required to make a written statement concerning matters other than matters relating to the performance of his official police duties. This clause is not to be interpreted in such a manner as to prevent questioning of individuals by superiors, or to prevent supervisors from requiring that written reports be filed at any time, with respect to the

conduct of police officers in the normal course of business, and will not generally apply to such information gathering by officers below the third level of supervision (e.g., sergeants and platoon commanders). No representative provided by the Association shall act in such capacity while on duty. It is understood that the rights herein granted will not be used to unduly delay the expeditious disposition of investigations of conduct. Where an employee is required to submit a written report in less than 24 hours under protest after being so ordered, questions concerning interpretation of this subsection (j) shall be subject to arbitration in the same proceeding as that involving the discipline.

(k) Any disciplinary action taken against a member of the bargaining unit by the Department shall be subject to review under Article 11 and the PBA President shall be notified of any disciplinary action taken, even if taken with the consent of the police officer involved.

(l) The Police Department will refrain from using polygraph tests on police officers who have successfully passed their probationary period. This prohibition shall not apply to the use of polygraph tests on applicants for employment or on police officers who have not completed their probationary period.

## ARTICLE 17

### DUTY AND SHIFT ASSIGNMENT

A.   In selecting individuals for duty and shift assignments to fulfill departmental needs, the following will be the determining factors as they relate to the requirements of the assignment:

(1)   Seniority

(2)   Experience

(3)   Education

(4)   Training

(5)   Evaluation of individual's performance where such is done on a regular departmental basis, including disclosure of said evaluation to the individual within a reasonable time after it is made.

(6)   Health, provided that good health shall not adversely affect an individual's assignability.

(7)   Skills and unique qualifications.

(8)   Requests of individuals

    (a)   provided that where a specific assignment request is made and the individual's eligibility for the assignment is determined, he will, upon request, be informed of the reasons for such action; and

    (b)   provided further that when an individual's

request for a specific assignment is not acted upon, he will, upon request, be given the reason therefore and, if known, the time when action will be taken; and

(c) provided further that when an assignment has been made, an individual who has submitted a prior request and is not selected will, upon request, be given the reasons within a reasonable time after assignment is made; and

(d) no more than two requests shall be submitted each six months by an individual. The latest two requests received from an individual will supersede all others; and

(e) the Association shall have the right to review such written requests for changes in assignment that have been submitted to the Department.

B.  Possession of particular skills, aptitude or other qualifications by individuals will not be used to unreasonably "freeze" them in a duty or shift assignment, where they have requested transfer and they are otherwise qualified for such transfer when such an opening arises.

C.  Personal and family situations may be considered in cases of bona fide individual hardship in duty and shift assignments.

**ARTICLE 18**

**SCHOOLING AND TRAINING**

Periodically, opportunities arise for the Department to send an officer on a full-time basis for extended training and education in matters relating to police work. Prior to selecting an officer for such training, the Chief will post a description of the educational opportunity for 10 calendar days on the Departmental bulletin board, and any officer desiring consideration for such training may so indicate by signing the list. In selecting individuals for further training and education, factors relevant to departmental needs will be the basis for selection in relation to the particular type of schooling under consideration. It is the purpose and intent of this clause to give available training and educational opportunities on as broad a basis as possible consonant with the aforementioned.

Additionally, the City will notify the union and the membership with regard to available training schools and interested officers will submit 10-1's if interested.

32

## ARTICLE 19

### NON-JOB RELATED SICK LEAVE

#### 19.1 Members Employed Prior to December 31, 1974

Except as modified by 7.1.2 of this Agreement, all employees who were members of the Police Department as of December 31, 1974 shall continue to be covered by the non-service connected disability policy set forth in Section 11-23 of Article 11 of the Revised General Ordinances of the city of Syracuse as enacted by General Ordinance effective July 1, 1965.

#### 19.2 Members Employed After December 31, 1974

All new members of this bargaining unit who become employed after December 31, 1974 shall be entitled to non-job related sick leave according to the following schedule:

| Service | Non-Job Related Sick Leave |
|---|---|
| Up to the first of January following date of hire | 10 hours per full month of service |
| from 1 to 5 years | 160 hours per calendar year |
| from 6 to 10 years | 200 hours per calendar year |
| from 11 to 15 years | 240 hours per calendar year |
| 16 years and after | 280 hours per calendar year |

The terms and conditions of this benefit shall be as follows:

A.   Unused sick leave may be accumulated up to a maximum of

33

1040 hours.

B.   Members of the Department during their first 3 years of service may, if necessary, borrow up to 440 hours of paid sick leave; which borrowed hours must be repaid, however, before any further accumulation of sick leave may occur.

C.   For purposes of applying the above schedule, the following example is given:  Assume a policeman is hired September 1, 1975.  Such policeman's non-job related sick leave benefit from September 1, 1975 through December 31, 1975 would be 40 hours.  Following this his benefit for each calendar year would be as follows:

| Calendar Year | Hours Paid Sick Leave |
| --- | --- |
| 1976 through 1979 | 160 per year |
| 1980 through 1984 | 200 per year |
| 1985 through 1989 | 240 per year |
| 1990 and thereafter | 280 per year |

## 19.3 General Conditions

Except to the extent expressly modified by this Article, the non-job related sick leave benefits set forth in Sections 19.1 and 19.2 are subject to the Departmental rules and regulations concerning the taking of non-service connected sick leave as in effect as of December 31, 1974; including the Departmental right to require approval by the Police Surgeon before any sick leave may be taken.   An employee on Sick Leave for a non-job related

34

illness or disability shall assign or pay over to the employer any amounts received as Workmen's Compensation for such illness or disability.

## 19.4 Sick Leave Incentive Program

Effective January 1, 1999, a sick leave incentive program will apply to those officers who are on the active pay roll for the full calendar year involved.  The sick time incentive program will be divided into three separate blocks of four months each. An employee that does not call in sick during a four month block will be entitled to a payment of $100.  Example:  An employee that calls in sick April 28, 29, and 30 does not receive $100 bonus for that time period.  If that employee calls in sick again on May 1 (beginning of a new time period), then they are ineligible for that second time period also.  The total amount of cash incentive for the year is not to exceed $300.  Payments are to be made before March 1 of the following calendar year.

Contributions to the Emergency Sick Leave Bank shall not be deemed to be "calling in sick"'.


## ARTICLE 20

### AUTOMOBILE ALLOWANCE

## 20.1 Allowance

Employees who are authorized in writing by the Department to use their automobiles on City business, shall be paid mileage

allowance of $0.16 per mile for miles actually driven in the course of such authorized performance of their duties.   Free gasoline will no longer be provided by the City for employees using their cars on City business.

## 20.2 Insurance Rider

Employees who are authorized in writing by the Department to use their automobiles on City business for more than 30 days in a calendar year shall be reimbursed, in addition to the allowance set forth in Section 20.1, up to $150.00 per year for the appropriate special business-use insurance rider upon presentation of written proof that such rider has been placed into effect and proof as to its cost.

## ARTICLE 21

## SAVINGS CLAUSE

Should any term or provision of this Contract be in conflict with any State or Federal statute or other applicable law or regulation binding upon the City, such law or regulation shall prevail.   In such event, however, the remaining terms and provisions of this Contract will continue in full force and effect.

## ARTICLE 22

### DOME VOLUNTARY OVERTIME LISTS

<u>22.1</u> The Chief will post a list for sign-up by officers who desire Dome overtime assignments which are to be performed by off duty police officers on a voluntary basis.  Such lists will be maintained in the Department Personnel Office and at the Front Desk and will be available for sign-up as follows:

| <u>Sign-up Period</u> | <u>For Overtime Dome Duty</u> |
|---|---|
| July 8 - 15 | Aug. 15 - Dec. 15 |
| Nov. 8 - 15 | Dec. 16 - April 15 |
| March 8 - 15 | April 16 - Aug. 14 |

PBA shall be given a copy of the Dome volunteer lists as soon as they become available.

<u>22.2</u> When assigning off duty police officers to voluntary Dome overtime work, the Chief will make such assignments from the applicable list by seniority order, on a rotating basis, of the officers in the rank for which the work is to be assigned.

<u>22.3</u> Refusal of such an offered overtime assignment shall result in the officer being charged as if he had performed the overtime assignment.  Three refusals of offered overtime (for reasons other than pre-scheduled paid time off or valid physical disability) within the life of any list shall result in that officer's being ineligible for inclusion on the next list.  Officers refusing an

37

offer of voluntary Dome overtime must do so within 24 hours of the offer or they likewise will be ineligible for Dome overtime during the life of the following list (this shall not apply when the officer fails to perform the assigned overtime because of valid physical disability or provable and valid emergency, e.g., death in family).

22.4 The City and PBA recognize that because of vacations, sickness, inability to locate an employee, administrative error or other reasons, full equalization will not be achieved at any given time. However, where an officer is missed for any such reason, the officer will be given preference for future Dome overtime until he is relatively equalized, as soon as practicable.

22.5 The minimum call-in time for off duty police officers for Dome work shall be four hours; except that it shall be six hours for Dome football games during the life of this agreement.

22.6 The City may use non-City employees for performances of Dome overtime work (i.e. traffic control) provided that when, and to the extent that, City employees are utilized, police officers who have indicated, by signing overtime Dome duty volunteer lists, a desire to work such duty shall be given preference before other City employees can be assigned.

## ARTICLE 23

### FUNERAL PAY

In the event of the death of a police officer's mother, father, spouse, child, brother or sister or any other relative residing in the officer's immediate household, the City will reimburse (no deduction from regular pay) police officers for actual loss of time from their scheduled work on any of the four consecutive calendar days beginning on the day following the date of death; provided in all cases that the police officer actually attends the funeral.  Said leave does not have to be taken in a continuous block of time-off, should circumstances require additional flexibility.  Officers not on duty shall not lose their full entitlement to bereavement leave.  Subject to the same conditions set forth above, the City will reimburse police officers for actual loss of time from their scheduled work on any of the three consecutive calendar days beginning on the day following the date of death of the police officer's mother-in-law, father-in-law, brother or sister-in-law, son or daughter-in-law or grandparent or grandchild.  The City is entitled to reasonable verification of the death and the officer's attendance at the funeral.  Days off need not be granted in the event of a City-wide emergency (e.g. a riot).

39

## ARTICLE 24

### MISCELLANEOUS PROVISIONS

24.1  The City shall continue to make free parking available in the North Garage for on duty officers for the duration of the agreement.  Such parking privileges are available to police officers only and not to their family members.

In the event that the North Garage is no longer available then free parking shall be provided at either the On-Center Garage or at the MONY Garage, the job site, or at the roll call site if roll call occurs at a site other than the Public Safety Building.

24.2  Effective June 1, 1994 each police officer assigned to the rotating work schedule shall be scheduled for a total of 243.00 days on an annual basis.  This schedule shall be implemented through a 4-2 work schedule.

Each police officer not assigned to the 4-2 work schedule will be credited with 6 additional bonus hours per month. Officers who transfer to and/or from said 4-2 shift shall be entitled to pro-rate said additional hours.

24.3 Effective January 1, 1999, there shall be an off-wheel vacation day adjustment and two additional days awarded.  The off-wheel personnel will receive 8 hours of compensatory time each month for a total of ninety-six (96) hours per year.  All hours are to be prorated for employees that switch to the off-wheel

schedule during the calendar year. [Explanation: This is an increase of 24 hours; 8 hours from the vacation day being converted to compensatory time to equal out all vacation schedules, and 16 hours coming from two additional days that the January 1, 1998 through December 31 Interest Arbitration Award provides.]

24.4 The parties agree to continue the existing experimental drug testing agreement subject to the duration clause set forth therein.

## ARTICLE 25

### EMERGENCY SICK LEAVE BANK

A. Eligibility

The City and the Association, realizing the economic effects of a long term illness on any Employee, have joined together in establishing a voluntary emergency Sick Leave Bank. All Employees who are represented by the Bargaining Unit of the Association and have completed at least one (1) year of continuous City service, shall be eligible to join. Membership is earned when an Employee voluntarily contributes two (2) days of their earned sick leave time to the Bank.

B. Emergency Sick Leave Board

1)   An Emergency Sick Leave Board consisting of three (3)

41

members (Trustees), of the Bargaining Unit, shall be appointed by the Association President for a term coinciding with the term of the President.

2)    The Board shall administer the Bank, be responsible for the accepting and recording of members, maintaining records regarding the number of sick leave days in the bank, and acting on each application for benefits submitted to it, within ten (10) working days.

3)    Decisions by the Board are final, subject to City approval that the Board acted in compliance with Section d.(1) of this Article.   If the City rejects the Board's determination and finds that the Board did not act in compliance with d.(1), the dispute will immediately be filed with the rotating permanent panel of arbitrators presently in place for a hearing and final determination.

## C.  Contributions

1)    All completed Emergency Sick Leave Bank Contribution forms must be received by the Board by the first of February each year or on dates mutually agreed to between the Association and the City.

2)    Once a contribution has been made, it **MAY NOT** be withdrawn.   Payroll clerks and/or the person responsible for the time and attendance records will distribute contribution forms applied to them by the Association.

42

3)   When the board decides that the Bank's remaining number of sick days has reached a level that requires further contributions, they will notify each member of this fact in writing, and will request a further contribution of one (1) or more days.   Membership in the bank can only be maintained by complying with such request.   Non-compliance will not result in previously contributed sick leave time being returned.

## D.  Eligibility For Benefits

1)   An enrolled member who has exhausted all of his/her accumulated furlough credits and is suffering from a prolonged or disabling illness or mental incapacitation and is not entitled to benefits as defined in Section 207-c of the General Municipal Law is eligible to apply to the Sick Leave Bank.   When applying for Emergency Sick Leave the Employee shall simultaneously request Extended Sick Leave.   A completed "Application for Emergency Sick Leave Bank Benefits" form shall be provided to the Board with any documentation deemed necessary by them with regard to the nature and duration of the disabling condition.   The Board shall have the right to disapprove an application for appropriate reasons, including improper use of accumulated time credits, i.e., suggesting a pattern of absences.   The Board shall also have the right, at any time, to consult with independent medical practitioners.

2)   After   finding   that   the   application   meets   the

requirement described above, the initial application may be granted for up to twenty (20) working days.

E.  Renewal of Application

If after making its original determination it is found that a member's recovery shall require more than twenty (20) working days, the board shall reconvene to determine renewal of the application for up to an additional twenty (20) working days. However, the maximum number of days the Board may allocate for any one illness shall not be more than one (1) work year.

## ARTICLE 26

### SENIORITY

The City and PBA agree that beginning January 1, 1999, the department will revert back to utilizing the seniority point system that was in effect prior to June 1, 1995.  Specifically, for promotional exams a member will be given 0.1 (one tenth) points per every three months of service, for a total of 0.4 (four tenths) points per year.  (Example:  A member with ten years and three months of civil service time will receive 4.1 points.)

## ARTICLE 27

### ACCIDENT REVIEW COMMITTEE

Effective January 1, 1998, the penalty for involvement in a preventable accident is to be based on the amount of damage the

patrol vehicle sustains in the accident, and no other factor.  No penalty will be enforced until the officer's right to appeal to the accident review committee is exhausted.  The below listed chart will be utilized by the department and the accident review committee in determining the number of furlough days to be assessed for a preventable accident.

```
(Less than)
$1,500.00      =    Written Reprimand
$2,000.00      =    Loss of one Furlough Day
$4,500.00      =    Loss of Two Furlough Days
$8,000.00      =    Loss of Three Furlough Days
$11,000.00     =    Loss of Four Furlough Days
$11,000.00+=   Loss of Seven Furlough Days
```

In the event that an officer desires to appeal a preventable determination/penalty assessment, the officer will have fourteen (14) days from receipt of the determination within which to file an appeal (through the PBA) to the chief's office.

The accident review committee will consist of six persons and a chairperson.  Three committee members will be selected by the PBA and three will be selected by the department.  The Chief of Police will choose the Chairperson, who shall run the meetings, but not vote except to break a tie.  The appellant must attend the appeal hearing and with the assistance of the PBA, shall present the appeal to the committee.

The Accident Review Committee will have three options in determining the validity of an appeal:  (1) They may uphold the

45

preventable determination and leave the penalty intact; (2) the Committee may determine that the accident was preventable, but with mitigating circumstances, in which case the committee may assess whatever penalty it determines to be appropriate ranging from leaving the original penalty in place, to reducing the penalty to a written reprimand; or (3) they may reverse the preventable determination and find the accident Non-preventable, in which event, the officer is then cleared with no punishment assessed.

The finding of the accident review committee is final and binding upon the department, the officer and the PBA. The accident review committee is the sole option available to an officer desiring to challenge a preventable determination by the department. (Arbitration is not available). Each off-duty member of the accident review committee will receive compensatory time for attending an appeal's hearing, plus one additional hour of compensatory time for travel.

The aforesaid chart will be utilized for any cases currently pending appeal.

## ARTICLE 28

### ENTIRE AGREEMENT

The City shall not be bound by any obligation or requirement that is not specifically set forth in this Contract, except to the extent that the same may have been, or may be modified and/or

clarified by side letter.   Neither the City nor the PBA will be required to negotiate on any matters or subjects, whether or not covered by this Contract, prior to 180 days before the termination date of this Contract.   However, the parties may, by mutual agreement, modify, delete or add to the provisions of this Contract during its term; but no such supplemental agreement or understanding will be binding on the parties unless approved in writing by the Mayor and the PBA.

## ARTICLE 29

### STATUTORY PROVISION

IT IS AGREED BY AND BETWEEN THE PARTIES THAT ANY PROVISION OF THIS AGREEMENT REQUIRING LEGISLATIVE ACTION TO PERMIT ITS IMPLEMENTATION BY AMENDMENT OF LAW OR BY PROVIDING THE ADDITIONAL FUNDS THEREFORE SHALL NOT BECOME EFFECTIVE UNTIL THE APPROPRIATE LEGISLATIVE BODY HAS GIVEN APPROVAL.

## ARTICLE 30

### TERMINATION AND MODIFICATION

This Contract shall be retroactive to the 1st day of January, 1998, and shall remain in full force and effect until the 31st day of December, 1999.   It shall be automatically renewed from year to year thereafter, unless either party shall notify the other in writing at least one hundred fifty days prior to the termination date or anniversary thereof, that it desires to terminate or

y this Contract.

**IN   WITNESS   WHEREOF**,   the   City   and   PBA,   by   their   duly

rized representatives, have executed this Contract on the

day of _August_ , 2000, at Syracuse, New York.

_[signature]_

City of Syracuse

July 27, 2000

_[signature]_ Jeffrey M. Piedmont

Syracuse PBA

48

# EXHIBIT  B

# SYRACUSE POLICE DEPARTMENT
## DISCIPLINE REPORT

Date __4 May 2000__  Delinquency #__3350__

Officer__Curtis Brown__  Rank __P.O.__  IBM__009__  I.A.D.# __00-62__

Bureau __Uniform__  Division / Platoon __Patrol 1__  Section _____

Details: (When, where, who, what, how, why, officer's assignment, etc.)
Attach supplemental report when necessary.

On 27 April 2000 P.O. Curtis Brown did engage in conduct likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old, thereby violating the New York State Penal Law.  This conduct was in violation of the Departmental Rules and Regulations Volume 1, Article 4, Section 1.13 A1 (Obedience to Laws, Ordinances and Rules).

Discipline Initiated by: Name & Rank __Captain Thomas C. Galvin__  IBM__226__

Signature: _Cpt Thomas C Galvin_  Date _5/4/00_

Discipline Endorsement by: Commanding Officer:
Name & Rank _____  IBM _____

Signature: _____  Date _____

Discipline Endorsement by: Bureau Commander:
Name & Rank __D/C. William Hanna__  IBM _____

Signature: _____  Date _____

From Bureau Commander to First Deputy Chief of Police:
Action Recommended _____

Signature: _____  Date _____

Final Action: _____ _Continued_, 5351 _____

Signature: _____  Date _____
Chief of Police

Discipline Served by: _____  Date _____ Time _____

Discipline Re-Served by: _____  Date _____ Time _____

Reason: _____

Arbitration Notice Received: _____  Date: _____

Form 9.17 (Rev. 9/99).

# SYRACUSE POLICE DEPARTMENT
## DISCIPLINE REPORT

Date__4 May 2000__ Delinquency #__3351__

Officer__Curtis Brown__ Rank __P.O.__ IBM _009_ I.A.D.# __00-62__

Bureau __Uniform__ Division / Platoon _____Patrol 1_____ Section _____

Details: (When, where, who, what, how, why, officer's assignment, etc.)
Attach supplemental report when necessary.

On 27 April 2000 P.O. Curtis Brown, while off duty, failed to maintain the highest standards of the law enforcement profession by engaging in conduct with a child of fifteen years, and that said conduct brought discredit to the Department and was in violation of the Departmental Rules and Regulations Volume 1, Article 4, Section 1.16 A 1&2 (Conduct).

Discipline Initiated by: Name & Rank____Captain Thomas C. Galvin____ IBM_226_

Signature: _Cpt Thomas Galvin_ Date_5/4/00_

Discipline Endorsement by: Commanding Officer:
Name __INTERNAL AFFAIRS SECTION__ IBM _____

Signature: __CONFIDENTIAL MATERIAL__ Date _____

Discipline Endorsement by: Bureau Commander:
Name & Rank ____D/C. William Hanna____ IBM _____

Signature: _____ Date _____

From Bureau Commander to First Deputy Chief of Police:
Action Recommended _____

Signature: _____ Date _____

Final Action: _Suspended without pay pending arbitration Termination proceeding_

Signature: _____ Date_5 Jul 2000_
Chief of Police

Discipline Served by: _____ Date _____ Time _____

Discipline Re-Served by: _____ Date _____ Time _____

Reason: _____

Arbitration Notice Received: _____ Date: _____

Form 9.17 (Rev. 9/99).

# EXHIBIT C

STATE OF NEW YORK                        COUNTY OF ONONDAGA
TOWN OF DeWITT
-------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

              -vs-


CURTIS A. BROWN

-------------------------------------------------------------

                              Plea disposition in the

                      above-captioned matter held on

                      June 20, 2000, before the

                      Honorable David S. Gideon.


APPEARANCES:

    For the People:        WILLIAM J. FITZPATRICK, ESQ.
                           Onondaga County District Attorney
                           John H. Mulroy Civic Center
                           Syracuse, New York  13202

                           BY:  ALISON B. FINEBERG, ESQ.
                           Assistant District Attorney


    For the Defendant:     THOMAS J. MILLER, ESQ.
                           108 West Jefferson Street
                           Syracuse, New York  13202


    The Defendant:         Present in person.


Reported by:
Mary Petty
237 Ridge Avenue
Liverpool, New York  13088
(315) 435-3916

2

THE COURT:  I'm going to call the case of the People versus Curtis A. Brown.  Before we start, I'll just go off the record for a minute.

(Whereupon recess is taken)

THE COURT:  Back on the record.  I would note the appearance of defense counsel, Thomas Miller, with his client Curtis A. Brown, the defendant; and on behalf of the People of the State of New York, present is Alison Fineberg.

I've had a brief discussion off the record with the defendant and his attorney regarding who the victim in this case is and we're all of the clear consensus here who the victim in this particular crime alleged is; and when I refer to the victim, I believe everybody's in agreement that we're talking about the same person.

MR. MILLER:  I would stipulate to that, Judge.

MS. FINEBERG:  Yes, your Honor.

THE COURT:  As much as the person is a minor, I want to keep the record clean.

MR. MILLER:  Understood.

THE COURT:  Okay.  I guess we're here for a plea today.

MR. MILLER:  That's right, Judge.

3

THE COURT:  It's my understanding there's going to be a plea of endangering the welfare of a child, in violation of Penal Law Section 260.10, Subdivision 1, in full satisfaction of the outstanding charges before this court.

It's my understanding that the agreed-upon sentence will be a conditional discharge on the condition that he stays out of trouble and further condition that there's an Order of Protection put into effect for three years to June 20th, 2003. Is that your understanding?

MR. MILLER:  It is, your Honor.

THE COURT:  Is that correct?

MS. FINEBERG:  It is, your Honor.

THE COURT:  Okay.  And, sir, do you understand that?

CURTIS BROWN:  Yes, sir, your Honor.

THE COURT:  Is that how you wish to proceed today?

CURTIS BROWN:  Yes, your Honor.

THE COURT:  I want you to understand that you have an absolute right to a trial by a jury.  Do you understand that?

CURTIS BROWN:  Yes, sir.

MS. FINEBERG:  Okay.  And at that trial the

4

burden of proof will be on the People of the State
of New York to prove you guilty beyond a
reasonable doubt.   That burden would not shift.
Do you understand that?

CURTIS BROWN:  Yes, sir, your Honor.

THE COURT:  At the trial you would confront --
have the right to confront the witnesses against
you and your attorney could cross examine those
witnesses.  Do you understand that?

CURTIS BROWN:  Yes.

THE COURT:  By pleading guilty, you give up
all of those rights and it would be just like you
were at trial, the issue of guilty is the final
determination.  Do you understand that?

CURTIS BROWN:  Yes.

THE COURT:  Other than what's been said here
today, has any other promises been made to you to
induce you to enter a plea of guilty today?

CURTIS BROWN:  No, sir.

THE COURT:  You're clear headed today?

CURTIS BROWN:  Yes, I am.

THE COURT:  You're not under any influence of
drugs or alcohol or anything illegal?

CURTIS BROWN:  No, I am not.

THE COURT:  Okay.  I would ask you, sir:  How

5

do you wish to plead to the charge of endangering the welfare of a child, in violation of Penal Law Section 260.10, Subdivision 1?

CURTIS BROWN:  Guilty, sir.

THE COURT:  Okay.

MS. FINEBERG:  Your Honor, I'm asking for a full plea allocution today.

MR. MILLER:  We're prepared to do so today along the lines of the misdemeanor information.

THE COURT:  I'm going to get to that right now.  I want to put a couple of notes in here.

MR. MILLER:  Understood, Judge.

THE COURT:  Okay, sir, then direct your attention to April 27th of 2000 at 5:00 p.m. in the Town of DeWitt.  Do you remember that date, time and location?

CURTIS BROWN:  Yes, sir.

THE COURT:  Or that date and time, excuse me.  It would be at the Extended StayAmerica Hotel located at 6630 Old Collamer Road, East Syracuse, New York.  Do you remember that location?

CURTIS BROWN:  Yes.

THE COURT:  And at that date, time and place, did you rent a room, Room 110, at the Extended StayAmerica Hotel?

6

CURTIS BROWN:  Yes, your Honor.

THE COURT:  And did you bring somebody to that room?

CURTIS BROWN:  Yes, sir.

THE COURT:  Did you bring the victim to that room on that date?

CURTIS BROWN:  Yes, I did.

THE COURT:  Did you know that the victim was 15 years of age?

CURTIS BROWN:  Yes, I did.

THE COURT:  Did you know she was a runaway from her residence?

CURTIS BROWN:  Yes.

THE COURT:  Which was in Cicero, New York?

CURTIS BROWN:  Yes.

THE COURT:  Okay.  Is that allocution sufficient?

MS. FINEBERG:  That is satisfactory, your Honor.

THE COURT:  Any legal reason why sentencing cannot be imposed?

MR. MILLER:  No, not that I am aware of.

THE COURT:  I'm prepared to proceed and make a motion to dismiss the remaining charge of --

MS. FINEBERG:  Obstructing governmental

7

administration.  People would so move.  People would move for sentence relying on our pretrial negotiations.

THE COURT:  Okay.  Do you want to say anything further on behalf of the People?

MS. FINEBERG:  Nothing further, your Honor.

THE COURT:  Anything you want to say, Mr. Miller?

MR. MILLER:  Very briefly.  I would join in the recommendation of the District Attorney's Office that Mr. Brown be sentenced to a conditional discharge.  As the Court is aware, he is a Syracuse Police Officer.  He's 25 years of age.  He's never had any trouble before.  He's been a police officer for the past five years.  He's been the recipient of several awards and recognitions by the Syracuse Police Department, including bureau and departmental awards.  He admits his responsibility on this particular incident, and with hindsight, realizes his conduct was inappropriate and he certainly accepts responsibility and apologizes for this.  He enters his plea after a great deal of soul searching and believes this is the appropriate disposition.

THE COURT:  So, Counsel, for the record, you

waive the ordering of a presentence investigation?

MR. MILLER:  I do waive that, Judge, and I've spoken to Curtis Brown as well on that issue.  I know that he wishes that, too.

MS. FINEBERG:  Is his appeal being waived?

MR. MILLER:  We have no grounds for appeal. We would waive that.

CURTIS BROWN:  Yes.

THE COURT:  Okay.  Sir, is there anything you would like to say?

CURTIS BROWN:  No, sir.

THE COURT:  Okay.  The sentence and judgment of the Court is going to be a one-year conditional discharge on the condition that he stays out of further trouble and there's going to be an Order of Protection issued, and the Protection will read as follows:  That it will direct you to stay away from the victim, her home, school, business, place of employment; refrain from communication by mail or by telephone, e-mail, voice mail or other electronic means with the victim and refrain in assaulting, stalking, harassing or reckless endangerment, disorderly conduct, intimidation, threats or otherwise interfere with the victim or members of her family.  And that will be in effect

9

until June 20th, 2003.  Do you understand that?

CURTIS BROWN:  Yes.

THE COURT:  I'm going to ask that you sign that.  I'll get you a copy of that.

(Whereupon Mr. Brown signs the Order of Protection)

MR. MILLER:  Your Honor, with regard to the Order of Protection, I certainly don't have any problem or concerns with him having any contact with this particular victim we mentioned before. I don't know whether or not the Order of Protection addresses the issue of his ability to carry handguns.  Since he's a police officer, I do have that concern.

THE COURT:  I have raised that issue between the telephone conversations going back and forth today, it's my position that the People were not going to request that it be restricted.  In that regard, I have not checked that box in there.

MR. MILLER:  Thank you.

MS. FINEBERG:  That's correct.

MR. MILLER:  Thank you.

THE COURT:  Also, there's a $125 surcharge.

MR. MILLER:  We're prepared to pay that now, Judge.

MS. FINEBERG:  Will you provide the People

10

with a copy of that Order also?

THE COURT:  Yes.

MS. FINEBERG:  Thank you.

MR. MILLER:  We acknowledge receipt, Judge.

MS. FINEBERG:  As do we, Judge.  All right,
Judge.

THE COURT:  Okay.

MR. MILLER:  Thank you, Judge.  Thanks.

(Proceedings were concluded)

# C E R T I F I C A T I O N

I, Mary Petty, Court Reporter, do hereby certify that I attended the foregoing proceedings, and took stenographic notes of the same, and that the foregoing typewritten matter is a true and accurate transcript of the same, and of the whole thereof, to the best of my knowledge and ability.


_____
Mary Petty


DATED: 6-28-00